**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:   MYSTIC TANK LINES, CORP.,

                                                     Case No. 04-28333 (RTL)

      Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

ALBERT A. CIARDI, III, Esq.
MICHAEL A. BOWMAN, Esq.
Ciardi & Ciardi, P.C.
(Attorney for Debtor)

DAVID A. NICOLETTE, Esq.
DONALD F. CAMPBELL, JR., Esq.
Nicolette & Perkins, P.A.
(Attorney for TMW Systems Inc.)

**RAYMOND T. LYONS, U.S.B.J.**

Mystic Tank Lines Corp. ("the Debtor") seeks expunction of a claim held by TMW Systems, Inc. ("TMW") arising out of a software license agreement. The Debtor asserts that it was not afforded the opportunity to inspect and evaluate the software pursuant to Article Two of the Uniform Commercial Code ("U.C.C.") and, alternatively, that the Debtor properly revoked its acceptance of the software. At issue is whether the goods delivered by TMW conformed with the product specifications outlined in the license agreement between the parties. Because the Debtor has failed to provide evidence that the software constituted non-conforming goods, the

1

Debtor has not met its burden to show cause to expunge TMW's claim.

## JURISDICTION

This court has jurisdiction over this contested matter under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B) to determine the validity of a claim.

## FINDINGS OF FACT

The Debtor is a trucking firm based in New York City and is engaged in the business of hauling fuel. TMW is a software company located in Cleveland, Ohio and is the maker of TMWSuite, a software program designed to assist the business operations of trucking companies.

During the summer of 2003, a representative from TMW contacted Peter Barker ("Barker"), Executive Vice-President of the Debtor, to inquire whether the Debtor would be interested in purchasing a license to operate TMWSuite. In early September of the same year, TMW conducted a demonstration of TMWSuite for the Debtor's management at the Debtor's headquarters in New York.

It is apparent that the Debtor expressed an interest in TMWSuite, at least in part, because it could be modified to meet the company's particular needs. Specifically, employees of the Debtor were impressed by the fact that TMWSuite had 1,000 switches that could be turned on or off at any time to configure the software in any required manner. In addition, Barker expressed interest in specific modifications that TMW had made for other TMWSuite licensees such as

multi-compartment functionality in rating and other fuel-oriented functionalities.  It should be noted that TMW considers configuration of TMWSuite to be an integral part of its business model and licensees routinely ask TMW to modify TMWSuite to suit their individual needs.  While TMW charge the licensee for a particular modification, the change is often incorporated into the standard form of TMWSuite and provided to other clients free of charge.

On September 30, 2003, the parties signed the license agreement under which TMW provided the Debtor with the right to use TMWSuite and additional software modules for a fixed fee of $264,303.00, technical support for three years at $48,844.00 and training services ranging from $1,000 to $1,200 per day.  The license agreement called for a down payment of 10% and the remaining balance was to be paid by the Debtor upon financing lease approval or by October 31, 2006, which ever came first.  The license agreement contained both a warranty stating that TMWSuite would perform as specified in the user documentation and disclaimers of all other warranties.

Warranties

> (a) TMW warrants to Licensee that TMWSuite will perform substantially as specified in the TMWSuite user documentation, which is incorporated by reference.  TMW's sole obligation and liability under this warranty shall be to undertake reasonable efforts to correct defects in TMWSuite, as modified for Licensee, which materially adversely effects Licensee, which in a reasonable time after customer notification of such defect in writing.  The term of this warranty shall be in effect so long as the Licensee maintains hotline support and maintenance and pays all charges in a timely manner.  TMW shall have no obligation to perform any work or provide any service, pursuant to this Agreement as long as Licensee is in default of any payment due and payable hereunder.
>
> (b) The warranty set forth in this section is exclusive and in lieu of any and all other warranties either expressed or implied or which may arise under law or equity.  Including the warranties of merchantability and fitness for a particular use or purpose.  TMW shall not be liable for any incidental or consequential damages

        or lost profits arising out of or in connection with the delivery, use or performance of TMWSuite , or in connection with the fulfillment of any obligation under this Agreement.  Under all circumstances whatsoever, TMW's liabilities under this agreement shall be limited to the total software license fees received by TMW from Licensee pursuant to this Agreement. Without limitation of the above, TMW grants no warranty that the software is error-free or will operate without interruption, and grants no warranty regarding its use or the results therefrom.

    TMW agreed to provide and install TMWSuite with capacity for a fleet of 500 trucks on the Debtor's computer system, based on the Debtor's assumptions on the future size of its fleet.  In 2003, the Debtor had embarked on a campaign to acquire short-haul fueling companies operating in the Northeast.  As of early September 2003, the Debtor had already acquired R.J Guerra, Inc. of Beacon Falls, Connecticut and Laber Russo Trucking Company, Inc. of Providence, Rhode Island.  The Debtor was also in talks to acquire Penn Tank Lines, Inc. ("Penn Tank") of Chester Springs, Pennsylvania at the signing of the license agreement.

    The Debtor had an Information Technology ("IT") department prior to and after the signing of the licence agreement.  While the Director of IT for the Debtor, Jack Lebovic ("Lebovic"), was present at demonstrations of TMWSuite, the negotiation and execution of the license agreement was largely handled by Barker.  It is apparent that Lebovic had a limited role in the selection of TMWSuite and its integration into the business operations of the Debtor.

    Upon the signing of the license agreement, the Debtor was required to make a 10% down payment.  No payment was made until November of 2003, when the Debtor delivered a check for $25,000.00 as down payment in exchange for the right to attend a TMWSuite user conference reserved for licensees.  Despite the fact that the Debtor had not paid the balance of the license fee that was then due, TMW installed TMWSuite for the Debtor on December 2, 2003 at its headquarters in New York and conducted a training session for the Debtor's employees.  Ten

4

days later, the Debtor informed TMW that the anticipated merger with Penn Tank had not materialized and, as a result, it would no longer need software capacity for a fleet of 500 trucks. The Debtor also advised that its financing was not approved and asked TMW to revise the terms of the license agreement so that it could pay the remaining balance in four installments. On December 29, 2003, the parties formally amended the license agreement to provide for the TMW's payment by installment.

Soon after amending the license agreement, the Debtor missed the December 23, 2003 deadline for its first installment payment. TMW placed a call in to the Debtor seeking payment and in January 2004 it received a check for $34,301.50 from the Debtor. The Debtor then failed to make the installment payments due on January 31 and February 28 of 2004. The Debtor had also fallen behind in making its quarterly technical support and training fee payments owed to TMW for services performed from December 2, 2003 through March 12, 2004. TMW billed the Debtor for technical support automatically on a quarterly basis, while the training sessions were billed at the end of each quarter if and when they accrued. TMW sent the Debtor two invoices totaling $31,264.57 for technical support. In addition to the December 2003 training session, TMW also held two other training sessions for the Debtor. TMW provided the Debtor with four invoices totaling $14,656.37 for training and installation. Despite TMW's repeated attempts to collect, the Debtor's account remained delinquent up until March 12, 2004 when TMW notified its employees to suspend services to the Debtor.

On March 24, 2004, a representative from the Debtor informed Jeffrey Ritter, the Chief Financial Officer for TMW, that the Debtor would be withholding payments because TMWSuite did not function as the Debtor had desired. In the hopes of remedying the situation, TMW

prepared a study of the gaps between TMWSuite as provided to the Debtor and the software as desired by the Debtor.  TMW found that while no defects existed in TMWSuite, the software was not able to perform certain functions without substantial modification.[1]  For example, the Debtor wanted the TMWSuite interface to display the different rates charged to customers based on the day of the week so that it could be available as an accessorial charge option.  While the user documentation for TMWSuite stated that licensees had the option to enact accessorial charges for items such as stop charges, cleaning, hand loading or unloading and fuel surcharge, there was no mention of day of week rates as accessorial charge items.  In addition, the Debtor's rates are based on the type of commodity shipped to customer and each commodity class has a different rate and minimum amount required.  The Debtor wanted TMWSuite to display all of this information on invoices where more than one commodity class was being hauled.  The Debtor was also dissatisfied that TMWSuite did not provide invoice imaging in the same manner as the Debtor's previous software.  In total, the TMW study (referred to as the "Gap Analysis" in the parties' papers) listed 21 gaps.  None of the functions requested by the Debtor were mentioned in the license agreement specifications, but TMW could have altered TMWSuite at additional cost to the Debtor.  TMW sent the Gap Analysis, along with cost estimates, over to the Debtor on May 5, 2004.  TMW failed to hear from the Debtor until it was informed of the Debtor's bankruptcy on June 3, 2004.

      The Debtor filed a motion in this court to expunge TMW's claim on the grounds that

---

[1] The distinction between a "gap" and a "bug" is important.  A bug refers to software that does not meet the specifications outlined in a license agreement.  A gap is software that does not perform tasks in the manner a buyer would like, but still conforms with the specifications in a license agreement. Bugs are the seller's responsibility.  Gaps may be remedied by the seller, but only at its own discretion and possibly at an extra charge.

TMW failed to give the Debtor adequate opportunity to inspect and evaluate TMWSuite pursuant to Article Two of the U.C.C. and, alternatively, the Debtor revoked its acceptance of TMWSuite and is not obligated to make further payments under the license agreement. The court conducted an evidentiary hearing in this contested matter.

## DISCUSSION

A proof of claim, timely filed and pursuant to 11 U.S.C. § 501, is *prima facie* evidence of a claim unless a party in interest objects under 11 U.S.C. § 502(a). Fed. R. Bankr. P. 3001. *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173-4 (3d Cir. 1992). If a party in interest wishes to object, the objector needs to overcome the presumption of validity through submission of evidence. *Id.* Here, the Debtor objects to TMW's claim on the basis that the Debtor never accepted the software because it never fully implemented it or, alternatively, that the Debtor seasonably revoked its acceptance. It should be noted that both parties agree that the license agreement is governed by Article Two of the U.C.C. as adopted in Ohio.

The nature of the Debtor's argument necessarily entails a discussion of the rights and responsibilities of a buyer and a seller under commercial law. Under U.C.C. Article 2, a seller is entitled to "the contract rate for any goods accepted". *O.R.C.* § 1302.65(A). Acceptance of goods occurs when the buyer, after reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that the buyer will retain them despite their non-conformity or fails to make an effective revocation of such goods. *O.R.C.* § 1302.64.[2] See

---

[2]*O.R.S.* § 1302.64. (UCC 2-606)
    (A) Acceptance of goods occurs when the buyer:
        (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

*George v. Fannin*, 67 Ohio App. 3d 703 (1990) (stating that the buyer's conduct was consistent with neither rejection nor revocation where she continued to use the goods for a year and did nothing more than refuse to make the final payment). The buyer, on the other hand, enjoys the right to reject non-conforming goods up until the point of acceptance. *O.R.C.* § 1302.65(B).[3] But in order to exercise this right of rejection, the buyer must be left with **non-conforming goods** from the seller. Where a buyer rejects the goods delivered by the seller, the buyer must identify the particular defect. If the buyer fails to identify the defect, it is precluded from relying on the unstated defect to justify rejection or breach where the seller could have seasonably cured the defect. *O.R.C.* § 1302.63(A)(1).[4] See *TLG Elecs., Inc. v. Newcome Corp.,* 2002 Ohio 882 (Ohio

---

(2) fails to make an effective rejection as provided in division (A) of section 1302.61 of the Revised Code, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

[3]*O.S.C.* § 1302.65. (UCC 2-607)
(A) The buyer must pay at the contract rate for any goods accepted.
(B) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by sections 1302.01 to 1302.98, inclusive, of the Revised Code for non-conformity.

[4] *O.S.C.* § 302.63. (UCC 2-605)
(A) The buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes him from relying on the unstated defect to justify rejection or to establish breach:
(1) where the seller could have cured it if stated seasonably; or
(2) between merchants when the seller has after rejection made a request in writing for a full and final written statement of all defects on which the buyer proposes to rely.

Ct. App. 2002) (stating that in its failure to identify any defect in delivered goods, buyer may not refer back over two years to claim that seller delivered nonconforming goods in hopes of establishing a valid rejection). Furthermore, the buyer bears the burden of proof in establishing that the goods delivered to the buyer failed to conform to the contract. See *Stelco Industries, Inc. v. Sherman Cohen*, 182 Conn. 561, 563-4 (Conn. 1980) (stating that the burden of proving non-conformance rests on the buyer).

In this case, the goods conformed to what was contemplated and anticipated by both parties in the license agreement. The license agreement called for the delivery and installation of TMWSuite; a particular and specific product defined by the specifications of the user documentation. Not only did the Debtor accept installation of TMWSuite, it accepted maintenance and training provided by TMW for months without making any payments other than the initial 10% down. The Debtor made no issue of TWMSuite's performance until after TMW attempted to collect payment. Despite the fact that the Debtor contracted for a specific software product in TMWSuite, the Debtor still had the option of paying for modifications to TMWSuite and declined. Given these facts, it is difficult to see how the goods delivered by TMW failed to conform to the license agreement. Furthermore, the Debtor has not even claimed, let alone proven, that anything was wrong with TMWSuite. In its papers, the Debtor simply states that TMWSuite does not function exactly as it would like; namely, it does not rate and price commodities in the manner the Debtor prefers or provide invoice imaging capabilities similar to the Debtor's previous software applications. Even this contention fails to support a rationale for withholding payment, as both parties clearly contemplated the possibility of future modifications at cost to the Debtor. Because the Debtor has not offered any proof of any defect

in TMWSuite, the Debtor has failed to show that TMWSuite is a non-conforming good in light of the license agreement. See *Alliance Wall Corp. v. Ampat Midwest Corp.,* 17 Ohio App. 3d 59 (Ohio Ct. App. 1984) (holding that the burden is on the buyer to demonstrate the grounds for rejection).   In the absence of seasonable rejection, the Debtor's actions can only be characterized as acceptance of conforming goods.  See *George v. Fannin,* 67 Ohio App. 3d 703 (Ohio Ct. App. 1990) (reasoning that a buyer's failure to demonstrate proper rejection or revocation of delivered goods amounts to acceptance).

Had the Debtor articulated its need for customized software in the license agreement, this court might have been able to grant the present motion.  In *Neilson v. Monteleone*, the plaintiff asked for software tailored to the plaintiff's particular needs.  *Neilson v. Monteleone*, 524 A.2d 1172 (Del. 1987).  The case effectively hinged on whether the defendant had breached the warranty for fitness for a particular purpose in selling plaintiff a software program that failed to meet plaintiff's requisite level of customization.  *Id.*  The court found that because the buyer had relied on the expertise of seller, defendant had breached its obligations as proscribed by commercial law.  *Id.* at 1176.

This case is different.  Here, TMW sold a specific software product to the Debtor.  The Debtor did not articulate a desire for customized software in the formation of the license agreement.  Instead, the Debtor entered into a contract where TMW warranted only that TMWSuite would perform substantially as specified in the user documentation.  The license agreement also expressly stated that the warranty provided by TMW was in lieu of any and all other express or implied warranties.  By correctly disclaiming the implied warranties of merchantability and fitness for a particular purpose, the license agreement bars the Debtor from

10

claiming that TMW delivered non-conforming goods.  See *Confer Plastics v. Hunkar Lab.,* 964 F. Supp. 73 (W.D.N.Y. 1997) (stating that an implied warranties of merchantability and fitness may be disclaimed where the agreement stated that the contained warranties were in lieu of all other warranties, express or implied).

It should be noted that this case does not involve an unsophisticated buyer.  In some cases, the shortcomings of a particular product when coupled with an unsophisticated buyer's reliance on the seller's judgment and skill could give rise to warranty liability.  See *In Re L.B. Trucking,* 163 B.R. 709, 722 (Bankr. D. Del. 1994).   In this case, however, the Debtor was a sophisticated business entity that had previously used software in its daily operations.  Also, the Debtor had an IT department headed by Mr. Lebovic.  The Debtor had ample time and resources to determine precisely which kind of software was required for its unique business needs.

## CONCLUSION

The Debtor has failed to provide evidence supporting its request to expunge TMW's claim.  As TMW has provided goods in conformity with its obligations under the license agreement, it is entitled to its claim.  For these reasons, the Debtor's request is denied.


Dated: November 13, 2006                    /S/ **Raymond T. Lyons**
                                            United States Bankruptcy Judge